# Staunton

### Simon Molofsky v. Rose Sigal.

September 7, 1949.

Record No. 3487.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Ashburn, Agelasto & Sellers,* for the appellant.

*William G. Maupin,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

Under date of February 27, 1941, Rose Sigal and Morris Sigal, as lessors, and Simon Molofsky, as lessee, executed a written instrument whereby the Sigals leased to Molofsky for a term of eight years, beginning September 1, 1941, and ending August 31, 1949, certain premises at the corner of Hampton boulevard and 99th street, in the city of Norfolk, at a stipulated rental of $400 per month plus a stated percentage of the lessee's gross monthly sales. The premises consisted of a storeroom on the first floor and a locker room and apartment on the second floor.

The instrument contained the following provision, the interpretation of which, and particularly the italicized portion thereof, is the subject of the present controversy:

"If during the term the demised premises shall be damaged by fire or the elements they shall be repaired by the lessor with all reasonable diligence; and in case they shall be so badly injured that they cannot be repaired with such diligence so as to be fit for occupancy within 30 days from such injury the rent shall cease from the date of the injury

until they shall be so repaired *and the tenancy shall not be terminated unless such repairs shall require more than 90 days* provided always, that there shall be no cessation of rent if the damages shall have been the result of the negligence, default, or willful act of the tenant or his agent or employees." (Italics supplied.)

During the term Morris Sigal died after having devised his interest in the property to his wife, Rose Sigal, who became the sole owner thereof and entitled to the privileges and chargeable with the obligations of the lease.

Molofsky entered into possession of the premises at the beginning of the term and continued to enjoy the same until March 11, 1947, when the building was so badly damaged by fire as to be untenantable until repairs had been made. The fire originated in a portion of the building which was under lease to another tenant, and was in no wise due to the negligence, default, or willful act of Molofsky, or any of his agents or employees.

Within two or three weeks after the fire the parties, with the assistance and advice of their respective attorneys, began to discuss their rights and liabilities as the result of the fire damage to the premises. Mrs. Sigal and her counsel took the position that the repairs would require more than ninety days, and that under the provisions of the lease quoted above the tenancy had *ipso facto* terminated with the occurrence of the fire.

While Molofsky and his attorney did not at that time question Mrs. Sigal's assertion that the repairs could not be completed within ninety days, they took the position that under the terms of the lease the tenancy was not *ipso facto* terminated by the fire, but that the tenant had the option either to terminate the lease or to insist on the reconstruction of the building and the continuance of the lease thereafter to the date of its expiration.

The building was located on land which was owned by the Virginian Railway Company and which had been leased to the Sigals for the term ending August 31, 1949, the date of the termination of the tenancy stipulated in the Sigal-

Molofsky lease. On May 10, 1947, the Virginian Railway Company gave Mrs. Sigal a lease extending her term to June 30, 1952. After the receipt of this extension from the Railway Company considerable negotiations took place between Mrs. Sigal and Molofsky with reference to the execution of a new lease, at an increased rental, for a new term to expire coincidental with the expiration date of the extended lease from the Virginian Railway Company. However, no such lease was consummated. Throughout these negotiations both parties adhered to their respective positions as to the correct interpretation of the fire damage provision in the lease.

On June 4, 1947, Mrs. Sigal's attorney wrote Molofsky that while she adhered to the position that the lease had been terminated by the fire, she offered to give him "a new lease for the conduct of a business similar in nature to that heretofore conducted by you on the premises, the term to begin on the date when building is tenantable and ready for occupation, and end on the 31st day of August, 1949," at the same rental "provided in your former lease." The letter called for a written acceptance on or before June 16, 1947.

Although the effect of this letter was to give Molofsky what he was entitled to upon the assumption that his interpretation of the fire damage clause of the lease was correct, he did not accept the offer but continued to negotiate with Mrs. Sigal for an extended term. On June 17, 1947, Molofsky's attorney wrote Mrs. Sigal that, "Unless you advise me within five (5) days after the date of the receipt of this letter that you intend restoring the premises to me under the terms and provisions of my lease with you, dated February 27, 1941, I intend to immediately institute suit."

Apparently this last letter ended the negotiations between the parties, and on July 18, 1947, Mrs. Sigal entered into a written lease whereby she leased the property to another tenant for a term "to begin on the date when the said demised premises are tenantable and ready for occupancy" and to terminate on June 30, 1952.

In August, 1947, before the repairs had been completed, Molofsky filed his bill for a declaratory judgment and consequential relief under the permissive provisions of the Declaratory Judgment Act (Michie's Code of 1942, sec. 6140-a, etc.), invoking as well the general equity jurisdiction of the court. The plaintiff's bill and the defendant's answer reiterated the positions which they had respectively taken with respect to the proper interpretation of the lease. After the evidence had been heard *ore tenus* the trial court announced its conclusion upholding Mrs. Sigal's contention that the tenancy had been terminated by the fire, and from a decree dismissing his bill the plaintiff tenant has appealed.

The legal questions presented are these: (1) Was there sufficient evidence to support the finding that the reconstruction of the building required more than ninety days? (2) If so, was the lease terminated by the fire?

The first question presents no difficulty. Promptly after the fire Mrs. Sigal consulted three reputable contractors about reconstructing the building. None of these would agree to complete the work within ninety days or within any specified time. She finally selected W. A. Hall who had been in the construction business in Norfolk for twenty years.

Hall was called as a witness for the plaintiff, Molofsky, and was the only person who testified as to the length of time necessary for the reconstruction of the building. He testified that he started the work on or about May 15, 1947, finished it early in September, and that operating with reasonable diligence and speed, with the proper force, he could not have finished it within three months. He further testified that he used as many mechanics as could reasonably be employed on the job, that he had a good force of men, and that the work proceeded with due diligence and without unforeseen delay. Moreover, he said that no contractor that he knew of, working with due diligence, could have finished the work within ninety days.

This uncontradicted testimony is, in our opinion, amply sufficient to sustain the factual finding that the time

necessary for the reconstruction of the building exceeded ninety days.

But the appellant tenant insists that even if the trial court be correct in holding that the necessary repairs occasioned by the fire required more than ninety days, yet it erred in holding that the tenancy was terminated by the fire. His argument runs thus: The language that "the tenancy shall not be terminated" unless the reconstruction requires more than ninety days "necessarily implies" some "act" by one of the parties to terminate the tenancy; since the entire fire damage provision in the lease, and especially the particular portion thereof with which we are concerned, is for the benefit of the tenant, the necessary inference is that such act or step must come from him; and consequently he is given the option to take this step and bring the tenancy to an end, or to refrain from such action with the result that the tenancy remains in force.

This reasoning will not withstand analysis. While the fire damage provision is for the benefit of the tenant, in that it relieves him of the obligation to pay the rent in case the premises are unfit for occupancy or use for an extended period, it does not necessarily follow that he is thereby given the further or added benefit of an option to terminate or continue the tenancy. Such an interpretation does violence to the elementary rule that the judicial expositor must construe the words the parties have used, but not make a new contract for them.

By appropriate language the parties could have vested such an option in either the landlord or the tenant, as is sometimes done, in case of the destruction of or extensive damage by fire to the leased building. Certainly, there is no such express language in the lease, and the words that "the tenancy shall not *be terminated*" unless the specified condition happens do not imply that such an option is given to either party. There is no reservation of right in either party to terminate upon the happening of the condition.

In our opinion the language that "the tenancy shall not be terminated unless such repairs shall require more than

ninety days" is, by necessary implication, an affirmative statement of intention that if the repairs shall require more than ninety days the tenancy shall be terminated. The words "shall not be terminated" are equivalent to the words "shall not be at an end" or "shall not terminate."

In *Manning, etc., Co.* v. *Keenan*, 73 N. Y. 45, the court was called upon to interpret a statute which provided, in substance, that when an officer has property in his possession under process and a third party makes affidavit of title thereto, the officer is no longer bound to keep the property or to deliver it to the judgment creditor, *unless the latter should on demand* indemnify the officer against the claim of the third party. The point was made that even though indemnity be offered, yet the statute placed upon the officer no affirmative duty to keep the property or deliver it to the judgment creditor. In disposing of this contention the court said:

"It is not to be denied that the section is not complete in expression. It is negative in form, and leaves the affirmative portion of the proposed enactment to be implied. When it says that the officer shall not be bound to keep the property, or to deliver it to the plaintiff, *unless* the plaintiff, on demand, shall indemnify the officer against the claim of the third party, though negative in form, it conveys the affirmative meaning, that if the plaintiff does so indemnify, then the officer shall keep the property or deliver it to the plaintiff. When it says that no claim shall be valid against the officer, *unless* made as provided in the section, though negative in form, it conveys the affirmative meaning, that if the claim is made as provided, it shall be valid against him; and if valid against him, then as a necessary result, inforceable (*sic*) against him by the other person making it, in any way known to the law for the inforcement (*sic*) of a valid claim against another, he denying and resisting it.

  *   *   *   *   *   *

"The word *unless* has the force of *except*; its primary meaning is 'unloosened from,' so what follows in the sentence after the word *unless* is excepted or unloosened from what

went before it; and though the officer is primarily bound by his process to keep the property, or to make delivery to the plaintiff, the service of affidavit of claim suspends that obligation and he is no longer bound so to do, unless indemnity is given, when he is again bound; * * *. For such a form of expression in a statute sometimes amounts to an affirmative enactment, and in fact *in proprio vigore*, confers all that is excepted from a negative or restrictive provision." (73 N. Y., pp. 55, 56.)

There are many instances in our own statutes where the language, through the use of "unless" or "except," though negative in form, necessarily imports an affirmative purpose.

For example, the title to Code, sec. 5194, as amended by Acts 1922, p. 474, reads: "Contracts, deeds, etc., that are void as to creditors and purchasers *unless* recorded." The body of the section provides that certain instruments in writing "shall be void as to all purchasers for valuable consideration without notice not parties thereto and lien creditors, until and *except* from the time" they are "admitted to record." (Italics supplied.)

Although the language employed does not expressly say so, the necessary inference is that if the instruments are admitted to record they are valid as to these parties.

Similarly, an affirmative purpose is implied from the negative provision of Code, sec. 5197, that "No mortgage, deed of trust, or other encumbrance created upon personal property while such property is located in another State shall be a valid encumbrance upon said property after it is removed into this State as to purchasers for valuable consideration without notice and creditors *unless* and until the said mortgage, deed of trust, or other encumbrance be recorded according to the laws of this State * * *." (Italics supplied.)

See also, Code, sec. 6471, as amended, which provides that "No judgment or decree * * * shall be a lien on real estate as against a purchaser thereof for valuable consideration without notice until and *except* from the time that it is duly docketed in the proper clerk's office * * *." (Italics supplied.)

And, so, in the instrument before us, while the provision is inartificially phrased in the negative, it expresses an affirmative intention that should the building be destroyed or so badly damaged by fire that it cannot be rebuilt or repaired within ninety days, the lease shall *ipso facto* terminate and come to an end.

The conclusion we have reached makes it unnecessary that we discuss the other questions raised in the briefs.

The decree is

*Affirmed.*